[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10600
Non-Argument Calendar

_____

D.C. Docket No. 3:14-cr-00019-CAR-CHW-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SHABAZZ SANGRIA WINGFIELD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(March 22, 2016)

Before HULL, WILSON and WILLIAM PRYOR, Circuit Judges.

PER CURIAM:

Shabazz Wingfield appeals his conviction for possession of a firearm in

furtherance of a drug trafficking crime and carrying a firearm during and in

relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). Wingfield entered a conditional guilty plea to this charge, reserving the right to appeal the denial of his motion to suppress evidence seized following the traffic stop that led to his arrest. On appeal, Wingfield argues that the district court erred in denying his motion to suppress, contending that the arresting officer lacked reasonable suspicion or probable cause to stop the truck in which he was riding as a passenger. After review of the record and consideration of the parties' briefs, we affirm.

## I.  FACTUAL BACKGROUND

On September 23, 2014, the district court held a suppression hearing in this case. Officer Robert Schulte of the Athens-Clarke County Police Department (ACCPD) testified to the following. Around 2:00 a.m. on November 21, 2013, while on routine patrol, Officer Schulte observed what appeared to be a Ford pickup truck moving slowly down a street in what he knew to be a high-crime and high-drug area. Officer Schulte was traveling in another direction, but turned his patrol car around and attempted to locate the truck. When Officer Schulte found the truck stopped at an intersection, he observed a gentlemen (later identified as defendant Wingfield) standing at the passenger-side door looking into the window. The pedestrian man turned to look at Officer Schulte and then "opened the door and jumped in the passenger seat, and the truck took off really quick." Officer

2

Schulte interpreted the man's reaction as "oh, crap, it's the police, and I need to go." Officer Schulte concluded that he had probably observed a drug deal, and followed the truck. The truck took, in Officer Schulte's opinion, a circuitous route that he believed was intended to lose him. Officer Schulte testified that the truck proceeded down Waddell Street, turned right on Dallas Street, left on Henderson Extension, and left on Rocksprings Street. Officer Schulte stated that if the truck had kept going down Waddell it would have come to Rocksprings anyway.

According to Officer Schulte, the truck stopped at a red light, used its turn signal, and made a right-hand turn. Rather than turning into the right lane as it was supposed to, Officer Schulte testified that the truck made a wide turn out into the left lane. Officer Schulte recognized this as an illegal action that he and his Department had routinely policed and that he had been taught was a traffic violation in an advanced traffic law class. Officer Schulte made a legal right turn to follow the truck and determined that there was no obstruction or roadway hazard that had prevented the truck from doing the same.

Officer Schulte got behind the truck and turned on the lights of his patrol car to initiate a traffic stop. The truck did not stop immediately, but instead traveled two blocks, only pulling into a parking lot after Schulte hit his siren. During the stop that followed, Officer Schulte first spoke with the driver, Bryan Little. Schulte asked Little for his license but the driver answered that he did not have one

3

because it was suspended.  Schulte confirmed through dispatch that Little's license was suspended and that he had two active warrants for his arrest (one for a felony probation violation involving cocaine possession).  Officer Schulte arrested and handcuffed Little.

During his interaction with Little, Officer Schulte observed that the passenger (Wingfield) had a hood over his face and did not look at Schulte.  Little and Wingfield provided conflicting answers as to how they knew one-another.  Another officer arrived on the scene and checked Wingfield's information, and Officer Schulte subsequently learned from dispatch that the "iLeads alert" database showed that Wingfield was known to carry a firearm and commit violent crimes.  Officer Schulte asked Wingfield to step out of the truck, which Wingfield did.[1]  Schulte observed a white substance that he suspected to be drugs on Wingfield's seat.  The substance was identified as cocaine, Wingfield was arrested, and a search of Wingfield's person produced a loaded nine-millimeter Smith & Wesson semi-automatic handgun.  A subsequent search of Wingfield's person produced a bag containing crack cocaine, powder cocaine, marijuana and oxycodone.[2]

---

[1]On appeal, Wingfield does not challenge the fact that Officer Schulte had a reasonable basis to ask him to step out of the vehicle.  Rather, Wingfield's claim is that Officer Schulte had no probable cause or reasonable suspicion to stop the vehicle in the first place.

[2]Ultimately, Wingfield was indicted for possession with intent to distribute cocaine base (Count I), possession of a firearm in furtherance of a drug trafficking crime and carrying a firearm during and in relation to a drug trafficking crime (Count II), possession of cocaine (Count III), possession of marijuana (Count IV), and possession of oxycodone (Count V).  After the district court denied Wingfield's motion to suppress the gun and illegal drugs seized from his

At the suppression hearing, Officer Schulte testified that he had worked for the ACCPD for eight-and-a-half to nine years, that he had worked in law enforcement for a total of eleven years, and that he had made at least two dozen drug arrests in the area where he initially saw the truck. On cross-examination, Officer Schulte testified that before making the illegal right turn, Little's truck had followed all traffic laws. While Schulte thought the truck "was getting out of there quickly" after Wingfield observed him, the truck was never speeding.

After most of Officer Schulte's above testimony, the government played a video taken from inside Schulte's patrol car that began immediately before the alleged illegal right turn. Schulte testified that the video depicted the truck taking a wide turn into the left lane and his own car taking a legal turn into the right lane.

The district court reviewed the video several times to determine what happened. The district court observed that the video did not capture the truck's entire turn. However, the district court also noted that the video showed the truck pulling away from the red light to turn, exiting the frame, and reentering the frame "not very far from the intersection at all" and fully in the left lane. The district court expressly found that, while making the right turn, the truck was not as close as practicable to the right edge of the roadway, as required by state law. [he

---

person after the traffic stop, Wingfield entered a conditional guilty plea to the firearm possession charge (Count II), and was sentenced to 60 months' imprisonment. In exchange for Wingfield's guilty plea, the remaining counts were dismissed on the government's motion.

district court found that Officer Schulte was "very credible and . . . experienced," and that his conclusions were informed by his experience and bolstered by the video evidence. Based on Officer Schulte's testimony and the video evidence, the district court stated that it did not think it was a close question that the truck committed a traffic offense.

The district court further indicated that Officer Schulte had reasonable suspicion to stop the truck even setting aside the illegal right turn. The district court specifically noted that: (1) Officer Schulte observed Little's truck around 2:00 a.m. in a high-crime area; (2) the truck was found stopped on the side of the road with Wingfield standing nearby but outside the truck; (3) Wingfield jumped into the truck after seeing Officer Schulte; (4) the truck "pulled off" quickly; (5) the truck took an unnecessary circuitous route as if the driver was attempting to lose the Officer; and (6) Officer Schulte had to turn his siren on, in addition to his lights, in order to get the truck to stop. The district court determined that these factors, in combination, provided Schulte with a reason to continue investigating. The district court noted that while it did not "think many of these [factors] make much difference standing alone," they "add[ed] up" to a situation that Officer Schulte could "investigate a little more."

The district court further noted that, after effecting the stop: (1) Wingfield kept his hood up and would not look at Officer Schulte; (2) Schulte learned that

6

Little was unlicensed and had active warrants (including one for felony cocaine possession); (3) Little and Wingfield offered conflicting stories concerning how they knew each other; and (4) Schulte learned that Wingfield was known to carry a firearm. The district court ultimately concluded that Officer Schulte had reasonable suspicion that Wingfield was involved in criminal activity at the point that Schulte ordered Wingfield out of the truck. The district court denied Wingfield's motion to suppress.

## II. ANALYSIS

On appeal, defendant Wingfield argues that Officer Schulte lacked the requisite probable cause or reasonable suspicion to stop Little's truck, and that therefore the evidence subsequently collected against Wingfield should have been excluded.[3]

The district court did not err in finding that Little's truck made an illegal right turn that gave Officer Schulte probable cause to conduct a traffic stop. An officer has probable cause to stop a vehicle where he observes that vehicle violate

---

[3]We apply a mixed standard of review to the district court's rulings on a motion to suppress. United States v. Ramirez-Chilel, 289 F.3d 744, 748-49 (11th Cir. 2002). We accept the district court's factual findings as true unless they are clearly erroneous, but review de novo the district court's application of the law to the facts. Id. at 749. We defer to the credibility determinations of the fact-finder unless the witness testimony credited is unbelievable. Id. (stating that we accept the fact-finder's choice of whom to believe unless "it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact-finder could accept it" (quotation marks omitted)). We may affirm the denial of a motion to suppress on any ground supported by the record. United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

a traffic law.  United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008).  The

Georgia traffic statute at issue states that the driver of a vehicle intending to turn at

an intersection shall do as follows:

> (1) Right turn.  Both the approach for a right turn and a right turn shall
> be made as close as practicable to the right-hand curb or edge of the
> roadway.

Ga. Code Ann. § 40-6-120(1).  Under a plain reading of this statute, Little's truck

was required to make a right turn into the right lane when it arrived at the

intersection in question.  The district court found that the truck instead made a

wide right turn into the left lane, based on Officer Schulte's uncontroverted

testimony to this effect and the video.  Although the video did not capture the turn

itself, the district court "dr[e]w some inferences" based on what the video showed

before and after the turn.  The district court's findings were not clearly erroneous.

Thus, the stop here was supported by probable cause.

Alternatively, the government argues that, even disregarding the traffic

violation, Officer Schulte had reasonable suspicion of illegal activity, based on the

totality of the circumstances, prior to stopping the truck.  See Harris, 526 F.3d at

1337-38 (explaining that an officer may conduct an investigatory stop of a vehicle

based on reasonable suspicion of criminal activity).  According to Officer Schulte:

(1) he observed the truck moving slowly down the street at 2:00 a.m. in a high-

crime and high-drug area; (2) the truck was stopped on the side of the road with

8

Wingfield standing beside it; (3) Wingfield jumped into the truck after seeing Officer Schulte; (4) the truck drove off quickly; (5) the truck took a circuitous route; and (6) the truck failed to stop immediately when Officer Schulte activated his lights.  These circumstances must be viewed in light of Officer Schulte's training and experience.  See United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000).

Given all of these particularized facts combined, the government has a strong argument that Officer Schulte had reasonable suspicion to justify conducting the traffic stop.  See United States v. Gordon, 231 F.3d 750, 756-57 (11th Cir. 2000); see also United States v. Lewis, 674 F.3d 1298, 1309 (11th Cir. 2012); United States v. Hunter, 291 F.3d 1302, 1306-07 (11th Cir. 2002).

Defendant Wingfield suggests that the district court found that reasonable suspicion existed only after considering Schulte's observations both prior to and during the stop, and argues that Officer Schulte's observations prior to the stop were insufficient on their own to create reasonable suspicion.  Wingfield stresses that the district court (a) did not find "any . . . real strong evidence of a crime" prior to the stop and (b) found that the case for reasonable suspicion only got stronger at the end of the stop, when Officer Schulte found that Little had no license and outstanding warrants and learned of the iLeads database report about Wingfield.  We need not resolve this reasonable suspicion issue because Officer

Schulte had probable cause to stop the truck in which Wingfield was riding. We find no reversible error in the district court's denial of Wingfield's motion to suppress.

**AFFIRMED.**